# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-00159-SCT

*FITZGERALD JEFFERSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/12/2000 |
| TRIAL JUDGE: | HON. R. I. PRICHARD, III |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MORRIS SWEATT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | CLAIBORNE McDONALD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 4/04/2002 |
| MOTION FOR REHEARING FILED: | 4/19/2002; denied 6/6/2002 |
| MANDATE ISSUED: | 6/13/2002 |

**BEFORE PITTMAN, C.J., EASLEY AND GRAVES, JJ.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. Fitzgerald Jefferson shot and killed Kentrell Brister after an argument over a game of cards. He was convicted of unpremeditated depraved-heart murder under § 97-3-19(1)(b) of the Mississippi Code by a jury in the Circuit Court of Marion County, Judge R.I. Prichard presiding. He was then sentenced to life imprisonment. He now appeals this conviction.

## FACTS

¶2. Fitzgerald Jefferson and Johnny Bullock went to the house of Monroe McGowan after lunch on August 18, 1999, to obtain an electrical breaker box for an old house. After learning that McGowan was not there, they decided to wait for his return. They joined three other people watching a card game being played by Tony Ervin, Kentrell Brister, and two others in the carport. Jefferson and Bullock eventually began playing cards with Ervin and Brister, and Jefferson placed a wager on his success. A scuffle broke out when Jefferson accused Ervin and Brister of cheating and grabbed the wagered money as if to leave. Taking offense, Ervin grabbed and punched Jefferson in the left eye a few times causing it to swell shut immediately. The fight ended when Jefferson released the money, and Ervin relented.

¶3. After the fight, Jefferson and Bullock began to leave McGowan's house when Jefferson testified he

overheard Ervin say to an onlooker "get me my gun." When Jefferson got to his car, he pulled out a 9 m.m. pistol and a rifle. Jefferson shot one round into the air with the rifle and then began shooting at Ervin. One of these shots struck Brister in the neck. Brister fled into the house, and someone locked the door behind him. Ervin escaped around the side of the house and saw Brister coming out the back door. Thinking Ervin had gone into the house, Jefferson shot the doorknob twice with the pistol in an unsuccessful attempt to gain entry. Upon seeing blood on the backdoor, Jefferson reasoned that Ervin might have gone through the house to the back yard, and he began to circumvent the house. It was then that he noticed Brister bleeding and lying on the ground in the backyard.

¶4. Jefferson gave his guns to Brister's brother for safekeeping and attempted to take Brister to the hospital in his own car. When the car overheated, Jefferson transferred Brister to a following car which reached the hospital. Brister died at the hospital from the gunshot wound in his neck. While he was at the hospital, Jefferson confessed to Deputy Sheriff Kevin Haddox that he shot Brister. Haddox took Jefferson to the Marion County jail where he was photographed and advised of his *Miranda* rights. Jefferson then gave a written confession to the crime. He was arrested the following day.

¶5. For reasons which the record does not disclose, the Marion County grand jury impaneled that September did not indict Jefferson. Unable to make bail, Jefferson remained in jail and was rearrested there on October 25, 1999. He then filed a demand for a speedy trial in the circuit court on November 3, 1999. The next grand jury was seated the following May, and Jefferson was indicted for murder on June 16, 2000. He was held without bail from then until his trial began on December 11, 2000. At no point between his first arrest and trial was Jefferson released from jail. He was arraigned on August 21, 2000. After a two-day trial, the jury returned a guilty verdict on December 12, 2000. Jefferson was sentenced to life imprisonment the same day.

## DISCUSSION

### I. WHETHER IT WAS ERROR FOR THE CIRCUIT COURT NOT TO ALLOW DEFENDANT'S WITNESS, CHARLES COLEMAN, TO TESTIFY FOR THE DEFENSE.

¶6. Jefferson's first claim of error is the trial court's refusal to allow him to call a witness because the witness's testimony was irrelevant and inadmissible. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Hughes v. State*, 735 So. 2d 238, 270 (Miss. 1999) (quoting *Fisher v. State*, 690 So.2d 268, 274 (Miss.1996) (citations omitted)).

¶7. Before the presentation of evidence, Jefferson announced his intent to call Charles Coleman, a Pentecostal preacher and active highway patrol officer, to the stand. Coleman was going to testify 1) that he had been praying with Jefferson the morning of the shooting and 2) had told Jefferson he had a vision that something bad was going to happen to Jefferson that day; specifically, that someone was going to try to kill him. He also told Jefferson as a precaution not to go where he was planning to go that day. The State objected to this proffered testimony, and the Court sustained its objection stating such evidence was inadmissible and irrelevant. Specifically the court said:

> The Court just finds that this remote incident some few hours before is not relevant. . . . And furthermore, if the defendant was so grasped by the vision that Reverend Coleman had that he believed he was in danger, he wasn't so grasped by the vision that caused him not to go. So he chose

to at this point in time utilize part of that vision, that is to claim self-defense, but ignore the other part, don't go.

So the testimony based on where they were having prayer . . . and the vision the Reverend Coleman had, this Court finds is inadmissible and not relevant and objection will be sustained.

Jefferson now claims this was error as the testimony is relevant to show his state of mind at the time of the shooting.

¶8. This Court has stated, "We cannot sanction the withholding of evidence from the jury which is highly probative of the defendant's state of mind or allow the trial judge to determine the reasonableness of the testimony."*Brown v. State*, 464 So. 2d 516, 520 (Miss. 1985). There, a defendant on trial for aggravated assault and pleading self-defense had approached the city prosecutor for assistance with an ongoing quarrel he was having with the victim. *Id.* at 518. The victim had threatened Brown on several occasions prior to Brown shooting him. *Id.* This Court reversed and remanded the case after it determined the trial court had erred in withholding this information from the jury. *Id.* at 520. The Court noted, the jury is "entitled to be made fully aware of all relevant facts which reflect apprehension, fear or anxiety in [Brown's] state of mind. Because such apprehension, fear or anxiety is a crucial element of self defense, the exclusion of this testimony had the effect of "whittling down" Brown's defense. *Id.* (citing *Eaton v. State*, 200 Miss. 729, 28 So.2d 230 (1946)).

¶9. At best, Coleman's testimony is minimally relevant. As Jefferson suggests, it would have informed the jury what might have been running through his mind several hours later when he overheard Ervin tell a bystander to "get my gun." However, this evidence is unlike most state of mind evidence this Court has examined when a defendant argues self-defense to the jury. Typically this evidence is of prior confrontations between the victim and the accused, as in *Brown*, which may also establish the possibility the victim was the first or initial aggressor in the case. *See generally Russell v. State*, 607 So. 2d 1107, 1116 (Miss. 1992). The instant case involves a nonspecific warning issued by a third party who had no prior contact with Ervin, and therefore could not know if Ervin ever intended to kill Jefferson. There is also no evidence in the record to suggest there were prior confrontations between Jefferson and Ervin. Therefore, there is little to suggest the warning had any other substance to support the truth of its message than its stated source: a vision. A trial judge is capable of determining when such information is "highly probative" and should reach the ears of a jury without the danger of confusion or wasting time. *See* Miss. R. Evid. 402.

¶10. As the State correctly points out, Jefferson told the jury he had been at a prayer meeting that morning thereby eliminating the need for Coleman's testimony to that end. As to the prophetic warning, we find that the information is relevant, and the trial court abused its discretion when it denied its submission to the jury. However, we find the error to be harmless in light of the evidence of Jefferson's overwhelming guilt as retold in the facts and examined in detail in Issue IV.

## II. WHETHER THE DEFENDANT'S RIGHT TO A SPEEDY TRIAL WAS VIOLATED.

¶11. Jefferson next claims his constitutional right to a speedy trial, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution of 1890, was violated by the delay between his imprisonment and trial. The constitutional right to a speedy trial attaches when a person is accused of a crime. *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989); *Perry v. State*, 419 So. 2d 194, 198 (Miss. 1982). A person is accused of a crime when they have been

arrested. *State v. Magnusen*, 646 So. 2d 1275, 1278 (Miss. 1994); *Perry*, 419 So. 2d at 198. Once the right to a speedy trial has attached, the Court must apply the four-part balancing test found in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether the defendant's right has been violated. *Smith*, 550 So. 2d at 408. *See also Brengettcy v. State*, 794 So. 2d 987, 992 (Miss. 2001); *Wells v. State*, 288 So. 2d 860, 862 (Miss. 1974). The four *Barker* factors are 1) the length of the delay, 2) the reason for the delay, 3) the defendant's assertion of his right, and 4) prejudice to the defendant. *Barker*, 407 U.S. at 530; 92 S.Ct. at 2192. No one factor is dispositive of the question. Instead, the totality of the circumstances is considered. *Id.* Nor is the balancing process restricted to the *Barker* factors to the exclusion of any other relevant circumstances. *Id.* at 533, 92 S.Ct. at 2193; *Brengettcy*, 794 So. 2d at 992; *McGhee v. State*, 657 So.2d 799, 802 (Miss.1995). Any delays in prosecution attributable to the defendant are not counted against the State. *Handley v. State*, 574 So. 2d 671, 674 (Miss. 1990); *Vickery v. State*, 535 So. 2d 1371, 1375 (Miss. 1988). However, "the risk of non-persuasion rests with the prosecution, and where the record is silent as to the cause of a delay, this factor must weigh in favor of the defendant." *Brengettcy*, 794 So. 2d at 993 (citation omitted). "The delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."*Jackson v. State*, 614 So. 2d 965, 969 (Miss. 1994) (citing *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117). We will now weigh the factors in light of the fact that Jefferson was charged with murder.

### 1. The length of the delay

¶12. Jefferson was arrested on August 19, 1999, and his trial for murder began on December 11, 2000. The total length of the delay between Jefferson's arrest and trial is four hundred eighty (480) days. Any delay longer than eight months is presumptively prejudicial triggering an analysis of the remaining factors. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2182; *Smith*, 550 at 408. However, this Court has denied dismissal of cases which have been delayed for longer periods than eight months . *See State v. Woodall*, 801 So. 2d 678, 687 (Miss. 2001). While this factor favors Jefferson, it alone cannot serve as the basis for dismissal of the charges against him. *Id.*

### 2. The reason for the delay

¶13. Before the trial court, the District Attorney speculated that Jefferson was not brought to trial sooner due to a backlog at the state crime lab resulting in a delay getting the evidence back for prosecution. There is also no explanation in the record why the September 1999 grand jury did not indict Jefferson despite the fact that Jefferson confessed twice to the crime and there were several eyewitnesses. The State concedes the time between convening of the September grand jury and June 16, 2000, when the May 2000 grand jury returned an indictment against Jefferson should weigh more heavily against it as there is no basis in the record to support the District Attorney's statement about the crime lab.

¶14. The State counters that the time between when the indictment was filed on June 16, 2000, and Jefferson's motion for discovery filed on July 10, 2000, should not count against it. It further submits Jefferson's delay in responding to its reciprocal motion for discovery should not count against it either. The State's motion was filed July 20, 2000, and Jefferson responded on December 6, 2000.

¶15. Jefferson claims he was served with the indictment June 27, 2000; over a week after it was returned by the grand jury. He also states that the delay after the indictment was served and before his trial was set on August 21, 2000, should count against the State. The reason: Jefferson could not be arraigned before

then since the trial judge presiding over Jefferson's case had not convened court in Marion County. Finally, he asserts that since the trial date of December 11, 2000, was set on August 21 and since Jefferson was tried on that date, his delay in responding to discovery did not result in the trial being delayed so the time should not be counted against him.

¶16. This Court has also looked to the number of days in the term of the trial court when determining who the delay should be counted against when setting a trial date. *Brengettcy*, 794 So. 2d at 993. *See also Barker*, 407 U.S. at 517, 92 S.Ct. at 2185. Marion County has eight terms of court a year meeting a total of twenty weeks. The terms are split between two circuit judges. The terms are scheduled so that the court sits in the county at least once every month. After Jefferson was indicted in June, the next term of court began July 3 and lasted for two weeks.[1] The following term began on August 21, the date on which Jefferson's trial was set.

¶17. We find that the State was primarily responsible for the delay in bringing Jefferson to trial. Even if the little over two months between Jefferson's indictment on June 16 and arraignment and trial setting on August 21 counted against him, there is still over a one year delay in bringing him to trial. The State's admitted delay in getting an indictment against Jefferson does weigh against it and constitutes the majority of the delay between Jefferson's arrest and trial. There is nothing to indicate that Jefferson was slow in asserting his right to a speedy trial nor dragging his feet between the time of his indictment and arraignment. This time should not count against Jefferson. For reasons explained further in this analysis, this results in no time being counted against Jefferson.

¶18. As the court calendar indicates, Jefferson was scheduled for trial at the earliest possible date. The time between August 21 and December 11 should count against neither party as this date was set by the trial judge and there was no further delay in proceeding to trial. Furthermore, during the time between the September 1999 grand jury's dissolution on January 4, 2000, and the next grand jury's empaneling in May of 2000, the State could not bring its charges to get an indictment. This time should not be counted against the State.

¶19. The time counting against the State is the period from Jefferson's arrest on August 19, 1999, until the dissolution of the September 1999 grand jury on January 4, 2000; plus the time from the empaneling of the May 2000 grand jury until an indictment was returned on June 16, 2000. The above accounting reduces the time counted against the State to roughly six months. While the delay possibly attributable to either party weighs more against the State, we find that six months is not unreasonable under the circumstances. This factor weighs in favor of neither party.

### 3. The defendant's assertion of his right to a speedy trial

¶20. "A defendant 'has no duty to bring himself to trial. . . . Still he gains far more points under this prong of the *Barker* test where he has demanded a speedy trial." *Brengettcy*, 794 So. 2d at 994 (quoting *Jaco v. State*, 574 So.2d 625, 632 (Miss.1990)). Jefferson filed his motion for a speedy trial on November 3, 1999, during the time the September 1999 grand jury was convened. The grand jury had not returned an indictment by this time, and no other regular meeting was scheduled until it issued its final report on January 4, 2000, and was dissolved. It appears from the record that this is the earliest logical time Jefferson could have asserted his right to a speedy trial. Jefferson's demand, even if the September 1999 grand jury's failure to indict did not become official until January 4, 2000, should not be held against him as being premature. Therefore, we find this factor weighs in Jefferson's favor, and the State concedes as much in its brief.

**4. Prejudice to the defendant**

¶21. We have stated:

> The final prong of the **Barker** analysis--prejudice to the defendant--has two aspects: (1) actual prejudice to the accused in defending his case, and (2) interference with the defendant's liberty. **Perry**, 637 So.2d at 876. The Supreme Court has identified three main considerations in determining whether the accused has been prejudiced by lengthy delay: (1) preventing "oppressive pretrial incarceration;" (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. **Barker**, 407 U.S. at 532, 92 S.Ct. 2182.

**Brengettcy**, 794 So. 2d at 994.

¶22. There is no evidence of actual prejudice to Jefferson. His only claim of prejudice stems from his incarceration and the stress and anxiety it caused him being unable to work, attend church, and maintain his name in the community before trial. Jefferson did spend over a year in jail prior to trial; the last six months being held without bail. However, being incarcerated alone, without proof of any anxiety and stress above and beyond that which normally occurs with being incarcerated or demonstrating how the particular incarceration is oppressive, is insufficient to show sufficient prejudice for this factor to weigh in Jefferson's favor. The anxiety he felt stemmed only from the actions which landed him in jail and the prospect of facing justice. Furthermore, the length of Jefferson's incarceration, almost sixteen months, was not oppressive as he could have been freed on bail up until June 16, 2000, resulting in his imprisonment without bail lasting only six months. In **Barker**, an incarceration of ten months before trial was ultimately upheld. **Barker**, 407 U.S. at 517, 92 S.Ct. at 2185). As he has shown no prejudice other than being incarcerated for over a year, we find this factor weighs in the State's favor.

¶23. In sum, Jefferson's trial was delayed for a presumptively prejudicial amount of time and he asserted his right to a speedy trial at the earliest possible point. These factors weigh in his favor. The reasons for the delay weigh against the State for, at most, ten months, but under our analysis only six months. For the reasons stated above, we find this factor favors neither party. Jefferson failed to demonstrate how his incarceration was oppressive or caused him anxiety beyond what is ordinary while awaiting trial. This factor weighs in favor of the State. It is our conclusion that the relevant factors and the facts surrounding the case indicate that Jefferson's right to a speedy trial was not violated and that this issue is ultimately without merit.

### III. WHETHER THE DEFENDANT'S RIGHT TO CONFRONT AND CROSS EXAMINE THE STATE'S WITNESS, TONY ERVIN, WAS UNCONSTITUTIONALLY LIMITED BY THE CIRCUIT COURT.

¶24. Jefferson's next assignment of error is the trial judge's ruling limiting his cross-examination of Ervin. Limitations placed on cross-examination are reviewed for abuse of discretion. **McDowell v. State**, 807 So. 2d 413, 422 (Miss. 2001) (citing **Ellis v. State**, 661 So. 2d 177, 184 (Miss. 1995). Rule 609 of the Mississippi Rules of Evidence deals with impeaching witnesses with prior convictions and provides as follows:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law

under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment.

Miss. R. Evid. 609(a). Jefferson contends the court abused its discretion when it prohibited him from cross-examining Ervin about a prior conviction for the sale of cocaine and refers this Court to its opinions in *Young v. State*, 731 So. 2d 1145 (Miss. 1999) and *White v. State*, 785 So. 2d 1059 (Miss. 2001). The State counters that Ervin volunteered the information that he was a convicted felon on cross-examination, therefore the trial court's ruling had no effect. We will examine the referenced cases in turn.

¶25. In *Young*, the defendant was on trial for murder. *Young*, 731 So. 2d at 1146. A witness for the State was asked in the presence of the jury if he had been convicted of burglary previously. *Id* at 1148. The witness responded negatively. *Id* at 1149. Outside the presence of the jury, the trial court ruled the prejudicial effect of the testimony outweighed its probative value under Mississippi Rules of Evidence 403 and 609. It stopped the cross-examination on this point and instructed the jury later to disregard the question and answer. *Id* at 1148. On appeal, this Court reversed Young's conviction and remanded the case for a new trial stating it was an abuse of discretion for the trial court to deny Young the opportunity to cross-examine the State's witness about the burglary conviction. *Id* at 1151. It held that prejudice to a witness plays no part in weighing the balance between the probative value and prejudicial effect of the witness's testimony on a party to the trial. *Id.*

¶26. In *White* the defendant was on trial for sale of a controlled substance. *White*, 785 So. 2d at 1060. The trial court denied a pretrial motion to allow White to cross-examine the State's star witness about a drug conviction because it did not relate to the witness's veracity. *Id.* at 1060-61. This Court on appeal, citing *Young*, reversed White's conviction and remanded the case for a new trial. *Id.* at 1063. The Court held the plain language of Rule 609(a)(1) does not require the prior conviction of a felony to involve dishonesty, false statements, or propensity for truthfulness to be admissible impeachment material on cross-examination. *Id.* at 1061. The Court stated the ultimate rule as follows:

> Given the constitutional right of a criminal defendant to confront those testifying against him, we interpret M.R.E. 609(a)(1) as allowing full impeachment of prosecution witnesses without the requirement of a balancing test, except in extreme situations such as where the prosecution witness has a prior conviction that is both highly inflammatory and completely unrelated to the charges pending against the accused.

*Id.* at 1062.

¶27. It appears the trial judge in the instant case made the same mistake as the trial courts in *White* and *Young*. When limiting the cross-examination of Ervin, the trial judge stated:

> Well, I think on sale of cocaine, that's not a crime the Supreme Court of Mississippi has designated as a crime of moral turpitude. So for the purposes of truth and veracity it would not be admissible.
>
> * * * *
>
> [W]hat I stated in the word [sic] was sale of cocaine would not be involved in Rule 609(A)(2), which is dishonesty of false statement regardless of punishment. And then, of course, if I [weighed] this sale of cocaine on probative and prejudicial, that I do not find to have any probative value as far as his

truth and veracity. It could be that he pled guilty to it was truthful in all aspects. I don't know. But I don't think it has any probative value and it certainly would have prejudicial value and it obviously would not have any probative value in an incident such as this, which was violent acts. And, also, I don't think there's any dispute but what (Ervin) hit the defendant first.

\* \* \* \*

Well, anyway I don't find that that conviction in and of itself would be admissible under Rule 609. I don't believe it would have any probative value.

After clearing up its confusion between Rule 609(a)(1) and (2), the trial court apparently weighed the conviction's probative value against its prejudicial effect in accordance with Rule 609(a)(1) before it limited cross-examination. In light of *Young*'s unequivocal holding, we find the trial judge erred in doing both. No balancing test should have been conducted in the instant case. It was an abuse of discretion to do so.

¶28. The State correctly points out that in his testimony on cross-examination, Ervin volunteered that he did not carry a gun because he was a convicted felon. We find this admission also coupled with the overwhelming proof of Jefferson's guilt makes the trial court's error in limiting the cross-examination of Ervin harmless.

### IV. WHETHER IT WAS ERROR FOR THE COURT TO DENY THE MOTION FOR DIRECTED VERDICT, WHETHER IT WAS ERROR TO DENY DEFENDANT'S INSTRUCTION D-1, AND WHETHER THE VERDICT WAS CONTRARY TO THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

¶29. Jefferson's final assertion of error is the trial court's denial of his motion for directed verdict, refusal to grant his request for a peremptory instruction to the jury, and denial of his motion for a new trial or, in the alternative, judgment notwithstanding the verdict. As these involve different standards of review, we will combine and address each as necessary.

### A. Motion for directed verdict, judgment notwithstanding the verdict, and peremptory instruction, D-1.

¶30. This Court employs the same standard of review for denials of motions for directed verdict and judgment notwithstanding the verdict and a request for a peremptory instruction. *Coleman v. State*, 697 So. 2d 777, 787 (Miss. 1997). Each challenges the legal sufficiency of the evidence presented at trial. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). We have stated:

Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*Coleman*, 697 So. 2d at 787 (quoting *Sperry-New Holland v. Prestage*, 617 So. 2d 248, 252 (Miss. 1993) (internal citations omitted)). *See also Edwards v. State*, 800 So. 2d 454, 463 (Miss. 2001).

Jefferson asserts had the jury based its verdict on the evidence, the only conclusion it could have reached was not guilty by reason of self-defense. The State counters with Jefferson's own testimony that his fight with Ervin had concluded. The evidence clearly indicates Jefferson shot Brister. The only question remaining to be answered is whether the State put forth sufficient evidence to create a factual question that reasonable and fair-minded jurors could form differing conclusions about whether Jefferson was acting in self-defense.

¶31. Jefferson testified that he acted in self-defense because he was afraid that Ervin was going to kill him after he overheard him say "go get my gun" to a bystander. He also testified that Ervin followed him out of the carport after the scuffle over the card game. Jefferson had parked across the street from the house. Jefferson testified Ervin was in the carport when he started shooting at him.

¶32. Other testimony indicates the fight that erupted between Jefferson and Ervin over the money in the card game had ended before Jefferson and Bullock began to leave. The same testimony indicates Ervin posed little threat to Jefferson before he began shooting. One witness said the fight over the card game had broken up and nobody was following Jefferson back to his car. He saw Ervin in the carport when the shooting began. Another said Ervin was in the carport when Jefferson went to his car and began running when Jefferson got his gun. She saw no one else with a gun that day. A third witness said the fight over the money had stopped and Ervin did not follow Jefferson to his car. Ervin himself testified that Jefferson told him to stay on the porch and he complied. After Jefferson began shooting, Ervin fled.

¶33. The conflicting evidence about whether Jefferson was acting in self-defense was sufficient to create a question for the jury. The jury ultimately found Jefferson was not justified in feeling threatened after a scuffle with an unarmed man who fled from his position in a carport across the street from Jefferson's car as soon as Jefferson began shooting. The substantial evidence supports the jury's conclusion. Since Jefferson has not met the burden of proving that reasonable jurors could not have reached a conclusion other than he was acting in self-defense, the jury's verdict is affirmed on these grounds.

### B. Motion for a new trial.

¶34. Unlike the above, a motion for a new trial challenges the weight of the evidence. *Edwards*, 800 So. 2d at 464. This Court has stated it will reverse a trial judge's denial of a motion for a new trial only upon a showing the court abused its discretion. *Todd v. State*, 806 So. 2d 1086, 1090 (Miss. 2001) (citing *Crawford v. State*, 754 So. 2d 1211, 1222 (Miss. 2000)). *See also Brown v. State*, 799 So. 2d 870, 872 (Miss. 2001). "Only in the cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Collier v. State*, 711 So.2d 458, 462 (Miss.1998). This Court will accept as true the evidence which supports the verdict and gives the benefit of all favorable inferences that may be drawn from the evidence to the prosecution. *Edwards*, 800 So. 2d at 465 (quoting *McFee v. State*, 511 So. 2d 130, 133 (Miss. 1987). *See also Crawford*, 754 So.2d at 1222.

¶35. The evidence of Jefferson's guilt weighs overwhelmingly against him. Uncontradicted testimony indicates that Jefferson went across the street to his car after a fight over a card game at McGowan's house. There he retrieved two guns, a rifle and a handgun, and shot the rifle several times towards a gathering of about eight people standing in a carport. While Jefferson's testimony indicates he was worried about Ervin shooting him, he was the only one seen in possession of a gun and the only one who fired. That such a reckless act resulted in the death of a bystander should come as no surprise to Jefferson. To affirm the jury's verdict in light of such evidence is not sanctioning an unconscionable injustice. This issue is void of

merit.

## CONCLUSION

¶36. In the above analysis, we have held that the trial court erred 1) in prohibiting Charles Coleman from testifying and 2) in limiting Jefferson's cross-examination of Tony Ervin, but we have held such error to be harmless. When discussing harmless error, this Court has stated:

> To warrant reversal, two elements must be shown: error, and injury to the party appealing. Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case; it is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it. Obviously, in order for the rule of harmless error to be called into play in support of a judgment, the judgment must be otherwise supportable, and will be reversed when there is nothing in the pleadings or evidence to support it.
>
> * * * *
>
> [A]n error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty.

*Gray v. State*, 799 So. 2d 53, 61 (Miss. 1999) (citations omitted). Having found error, we now examine the record for injury to Jefferson resulting from the error. The evidence that Jefferson was acting in self-defense, aside from Charles Coleman's proffered testimony, was presented in full to the jury in the form of Jefferson's testimony about the fight and the overheard statement and other eyewitness accounts of the same facts which differed from Jefferson's version. The jury rejected Jefferson's self-defense claim. We therefore find the trial court's error excluding Coleman's testimony to be trivial as it did not prejudice any substantial right of Jefferson's to the extent that the final outcome of the case was affected.

¶37. Jefferson reaped the benefit of having Ervin exposed as a convicted felon in front of the jury. The trial court's error limiting the cross-examination of Ervin is also harmless because the jury was aware of the Ervin's conviction. Ervin volunteered that he was a convicted felon on cross-examination. The record reveals the facts of Ervin's conviction for sale of a controlled substance were in no way related to the shooting and further inquiry into the conviction on cross-examination would only reveal the nature of the felony charge and the length of sentence to the jury. Therefore, the only impeachment value the conviction had for Jefferson was any lack of trustworthiness the jury would assign to Ervin's testimony in light of his being a convicted felon. As the conviction did not involve dishonesty and thereby provide even more damning value to impeaching Ervin on his conviction, the purpose of exposing Ervin as a convicted felon was ultimately accomplished, and the conviction's value for impeachment purposes was realized.

¶38. As to the remaining issues, Jefferson's right to a speedy trial was not violated by the delay between his arrest and trial and the weight of the evidence against him introduced at trial supports the verdict and is sufficient to affirm the jury's verdict in this case. Therefore, the judgment of the Marion County Circuit Court is affirmed.

¶39. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**McRAE AND SMITH, P.JJ., WALLER, DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. COBB, J., CONCURS IN RESULT ONLY.**

1. Jefferson claims the other circuit judge presided over this term.